UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT LEXINGTON**

LEWIS D. HOWARD,                    )
                                    )
        Plaintiff,                  )   Civil Action No. 5:07-291-JMH
                                    )
v.                                  )
                                    )
MICHAEL J. ASTRUE,                  )
COMMISSIONER OF SOCIAL              )   **MEMORANDUM OPINION AND ORDER**
SECURITY,                           )
                                    )
        Defendant.                  )
                                    )

                **      **      **      **      **

        This matter is before the Court upon cross-motions for summary
judgment on the plaintiff's appeal of the Commissioner's denial of
her application for Supplemental Security Income and Disability
Insurance Benefits [Record Nos. 12, 13].[1]   The Court, having
reviewed the record and being otherwise sufficiently advised, will
deny the plaintiff's motion and grant the defendant's motion.

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

        Plaintiff filed for disability benefits on August 4, 2004,
alleging an onset of disability of June 15, 2004, due to back pain,
the loss of one kidney, hearing loss, gout, anxiety, dizziness,
inability to climb, swelling and pain in his feet, and inability to
stand for any length of time without pain.  [AR at 15, 40-41.]  His

---

        [1] These are not traditional Rule 56 motions for summary
judgment.  Rather, it is a procedural device by which the parties
bring the administrative record before the Court.

1

claim was denied initially on November 30, 2004 [AR at 21B], and again on March 18, 2005 [AR at 21A.] He then timely requested a hearing on May 16, 2005. [AR at 22.] A hearing on his application was conducted on November 14, 2006, and his application was subsequently denied by Administrative Law Judge ("ALJ") Roger L. Reynolds in a decision dated December 15, 2006. [AR at 15-21; 375-415.] Plaintiff timely requested a review of the hearing decision [AR at 11], which was denied on July 16, 2007 [AR at 7-9.] This matter is ripe for review and properly before this Court under § 205(c) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff was fifty-eight-years-old at the time of the final decision by the ALJ. [AR at 21, 21A, 380.] He has at least a high school education and is able to communicate in English. [AR at 20, 368.] He has past relevant work experience as a heavy equipment operator for the State Highway Department. [AR 60, 410-11.] He is retired from that job. [AR at 368, 380-81.] At the time of the hearing, Plaintiff was doing some cattle farming on land that he owned – rolling hay, riding tractors, and tending cattle – with help from friends and neighbors.[2] [AR at 405-06, 410.] His gross

_____

[2]   Plaintiff suggests in his Motion for Summary Judgment that the ALJ's questioning about the operation of the family farm was somehow untoward, arguing that his farming efforts were "a fact not in evidence or of record." [Pl. Brief, Record No. 12, at 4.] This is simply not the case. In fact, the record before the ALJ contained a reference to Plaintiff's farming activities, in Plaintiff's Central Baptist Hospital Emergency Room record, dated September 23, 2005. [AR at 342 ("He is currently farming. He has several head of cattle.").] It is not surprising that the ALJ

earnings from his cattle farming operations were around $5,000 in 2005.[3]  [AR at 381-82.]

Treatment records contained in the administrative record show that Plaintiff had tympanomastoidectomies on both ears and a nephrectomy, procedures performed at Central Baptist Hospital in the 1980s.  [AR at 102-238.]  Records from Plaintiff's treating physician, Pablo Merced, M.D., reflect treatment from 1997 through 2004 for a variety of ailments, including hemmorhoids, urethritis, bronchitis, upper respiratory infection, lower back pain (reportedly due to pulled muscle after carrying heavy chainsaw), a cut on his right wrist due to contact with barbed wire, as well as complaints of earache, fever, dizziness, and sores.  [AR at 291-97.]  Dr. Merced's records also reflect that Plaintiff was seen on February 7, 2002, for depression and again on February 21, 2002, complaining of recurrent panic attacks and depression with frequency.  [AR at 292.]  Dr. Merced diagnosed Plaintiff with depression and panic disorder.  [*Id.*]

His mental health treatment by Dr. Merced is part of a period

_____

asked questions about Plaintiff's farming activities during the administrative hearing.  [*See* AR at 381-84.]  Having been asked, Plaintiff responded.  [*Id.*]  That testimony is in evidence and of record.

[3]      The ALJ indicated that Plaintiff's testimony and evidence in the record suggested that Plaintiff was engaging in substantial gainful activity as defined in 20 C.F.R. § 404.1572, but, giving Plaintiff the benefit of the doubt, he proceeded to the next step in the sequential disability analysis.  [AR at 17, 342.]

of intensive mental health treatment in 2002, including a brief hospitalization at St. Joseph Hospital and outpatient counseling at St. Joseph Behavioral Medical Network.  [AR at 247-62, 292.]  On January 29, 2002, shortly after his father-in-law had been diagnosed with cancer and committed suicide and following difficulties related to his daughter's employment, Plaintiff was admitted through the emergency room at St. Joseph Hospital, where he reported a lack of energy, suicidal ideation, and the inability to sleep.  [AR at 247.]  He was diagnosed with depression, prescribed anti-depressant medication, and discharged on the evening of January 30, 2002.  [AR at 247, 253, 255, and 398.]

During follow up treatment, first recorded on February 25, 2002, he reported that he had stopped taking medication (Celexa, Zoloft, and Buspar) for depression due to side effects.[4]  [AR at 260.]  He was sleeping less and his memory and concentration were decreased, but his appetite and energy were "ok."  [AR at 260.]  He described his own mood as anxious but that he sometimes felt "ok."  [AR at 261.]  The clinician with whom he met, Evelyn Parrish, ARNP, observed that he had "depressed mood with anxious affect."  [AR at 261.]  Later, on March 13, 2002, his sleep, appetite, memory, concentration, and energy were improving, and he stated that he was

---

[4]   During the course of his follow-up treatment he was prescribed Remeron, Vistaril, and Zyprexa [256-59, 261.]  At the time of the administrative hearing, he was no longer taking this medication.  [AR at 398.]

4

"doing a little better but I am real forgetful and that bothers me a lot. I also get nervous easy." [AR at 259.] Later that month, on March 27, 2002, he reported that he was "not doing well. I have had a cousin kill himself last week and that has really set me back. I am just not myself and not sure how to get myself back." [AR at 258.] He reported that his sleep, appetite, memory, concentration, and energy were "decreased." [*Id.*] Nonetheless, he was noted as having a "pleasant mood and affect," "logical and goal directed" thought process, and was without suicidal or homicidal thoughts. [*Id.*]

On April 29, 2002, he reported that his sleep, appetite, memory, concentration, and energy were "improving", and that he was "feeling a little better but seem[ed] to be sleepy in the mornings." [AR at 257.] On June 5, 2002, he reported that his sleep and appetite were "ok" and his memory, concentration, and energy were improving. [AR at 256.] He denied suicidal or homicidal thoughts, and was noted to have a "brighter mood and affect" with a "logical and goal directed" thought process. [*Id.*] There are no mental health treatment records dated after June 5, 2002, in the record.

Plaintiff was seen for certain gastrointestinal complaints in 1999. [AR at 239-43.] In 2002, he complained of ear pain to Dr. Robert D. Woods, who had earlier performed Plaintiff's tympanomastoidectomies. [AR at 244.] Dr. Woods diagnosed left

5

chronic otitis media and recommended another tympanoplasty, but there is no record that Plaintiff has had that procedure performed. [AR at 244.]  The records of Dr. William R. Crowe, Jr., dated from 2002 through 2005, indicate that Plaintiff has a history of chronic prostatitis, treated with prostate massage, Bactrim, and doxycylcine, the symptoms of which ultimately resolved. [AR at 298-311.]  Plaintiff also suffers from and has been treated for gout and reports a history of pain and swelling in both feet. [AR at 263-65, 311.]  During the administrative hearing, he testified that his podiatrist had prescribed Celebrex and inserts for his shoes. [AR at 390.]  He testified, as well, that he takes medication for gout only when it "flares up."  [*Id.*]

Treatment notes from the office of Gregory V. Osetinsky, M.D., dated June 16, 2005, further confirm Plaintiff's complaints of hearing loss and underlying problems with his inner ear.  [AR at 338.]  Finally, treatment notes from the Emergency Department at Central Baptist Hospital, dated September 23, 2005, indicate that Plaintiff has experienced chest pain and was diagnosed with atypical chest pain and hypertension.  [AR at 341-44.]  A follow-up visit with a cardiologist, Dr. John H. Thomas, is recorded in the record, as well.  [AR at 367-69.]

During an agency consultative examination with Rita D. Ratliff, M.D., Plaintiff complained of foot pain, back pain, and frequent urination.  [AR at 266.]  Dr. Ratliff found that he walked

with a "normal gait and station." [AR at 267.] Although his "[h]earing was decreased to normal conversational speech," the examination was otherwise unremarkable. [AR at 268.] Indeed, she found no "detectable paraspinal muscle spasm" and observed that he "had full range of motion of the spine with no complaints of pain," could walk on his heels and toes (although he was somewhat unsteady), could squat without difficulty, and had no motor deficit. [AR at 268.] Upon an x-ray, she noted "osteophytes in the end places especially at T12-L1," but no other bony or soft tissue abnormalities. [AR at 268.] With regard to his foot pain, she found no abnormalities of his feet upon examination, but noted his own report of past x-rays showing degenerative changes and his report of improvement after taking Celebrex and wearing shoe inserts. [*Id.*] As to his back pain, she recorded a "normal examination of the spine with no evidence of motor neurologic defect . . . [and] no abnormality on examination of the spine." [AR at 269.] She ascribed his complaints of frequent urination to his reported diagnosis of prostatitis for which he was then being treated with antibiotics. [*Id.*] Finally, with regard to his complaints of gout, she noted his report of two past episodes and the fact that he was neither taking prophylactic medication nor had any evidence of acute gout during her examination. [*Id.*]

Based on the examination, Dr. Ratliff concluded that:

> [T]here is no evidence for restriction of
> stooping, bending, reaching, sitting,

7

> standing, moving about, lifting, carrying,
> handling objects or traveling. His activities
> would be as tolerated by pain, especially when
> he has a flare up of gout. [H]e did not use
> an assistive device for ambulation. Gross
> manipulation is normal.

[*Id.*]

During an agency consultative psychological examination, Harwell Smith, Ph.D., noted Plaintiff's admission that he suffers from anxiety but that Plaintiff "does not consider anxiety to be an emotional problem. [AR at 273.] He noted further that Plaintiff fears that his depression could reoccur if he were to return to work. [*Id.*] Dr. Smith diagnosed major depression, in partial remission, and assigned him a GAF of 55. [*Id.*] Dr. Smith noted, with regard to Plaintiff's prognosis, that Plaintiff wanted to deny to himself and others that he has any psychiatric symptoms, which was not a good prognostic sign. [*Id.*] As to Plaintiff's functional capacity, Dr. Smith found that:

> [Plaintiff's] ability to do his activities of
> daily living is good. His ability to interact
> socially is fair. His ability to tolerate
> stress is fair. His ability to complete tasks
> is good.

> [Plaintiff's] ability to understand and
> remember two step instructions is good. His
> ability to show sustained concentration and
> persistence on tasks is fair. His ability to
> interact socially with people at work is fair.
> His ability to adapt o[r] respond to the
> pressures of a day-to-day work setting is
> fair.

[AR at 274.]

A non-examining, consulting psychiatrist, Stephen Scher, Ph.D., opined that Plaintiff suffers from major depression, in partial remission, that he suffered no restrictions of daily living and no episodes of decompensation of extended duration, and that Plaintiff had only mild difficulties in maintaining social functioning, concentration, persistence, or pace. [AR at 276-89.] Another non-examining, consulting psychiatrist, Jay Athy, Ph.D., also found that Plaintiff suffered no restrictions of daily living and no episodes of decompensation of extended duration, that Plaintiff had only mild difficulties in maintaining social functioning, concentration, persistence, or pace. [AR at 313-26.]

In evaluating Plaintiff's physical residual functional capacity, non-examining agency consultant Lynell Carter Dupont, M.D., observed that no exertional, postural, manipulative, or visual limitations had been established. [AR at 328-35.] She found that Plaintiff did have limited hearing and would, thus, "have difficulty performing jobs which required excellent auditory acuity, such as the frequent use of a telephone, especially with a high level of background noise." [AR at 332.]

During the administrative hearing, Vocational Expert (hereinafter, "VE") Linda Sparrow offered testimony. As an initial matter, VE Sparrow requested further information on how much weight Plaintiff had been required to lift during his employment with the Highway Department. [AR at 409.] Upon questioning by the ALJ,

Plaintiff testified that he lifted items weighing up to 150 pounds, for example concrete or sand, and had performed tasks such as shoveling and using chainsaws.  [AR at 409-10.]  The VE then testified that Plaintiff's past work, considering his testimony about lifting and the exhibits she had reviewed, would be characterized as "[v]ery heavy, semi-skilled."[5]  [AR at 410.]

The ALJ presented the VE with the following hypothetical:

> If we assume a person of Mr. Howard's age, education and experience with primarily – let's say, first of all, non-exertional impairments – I'm going to run through those first.  It would include no climbing of ropes, ladders or scaffolds, no operation of foot pedal controls with the left foot or leg, no work in excessively noisy environments or where acute hearing is required for safety or job performance.  Further would require repetitive work with no frequent changes in work routines, no requirement for detailed or complex problem solving or independent planning.

[AR at 410-11.]  The VE then testified that such a person could not perform Plaintiff's past work, but that there existed entry level jobs with no lifting restrictions at the medium level, including cleaning jobs, and at the light level, including housecleaning jobs.  [AR at 411.]  She further testified that he had no transferable skills from his past work as they would be industry specific.  [*Id.*]  She testified that if Plaintiff were limited to

---

[5]    When queried by the ALJ, the VE also classified cattle farming as "heavy and semi-skilled."  [AR at 410.]

either light or sedentary work at his age, fifty-eight, he would be considered disabled under the medical vocational guidelines. [AR at 411-12.]

The ALJ then asked:

> [I]f we assume that standing or walking is limited to two hours a day or less because of gout metatrsalgia, that would reduce the work – you can't work at a medium exertional level with a two hour standing or walking limitation?

[AR at 412.] The VE testified that such a limitation would reduce his work level to "light or sedentary." [*Id.*]

On December 15, 2006, the ALJ made the following findings of fact in determining that Plaintiff was not entitled to disability benefits:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since June 15, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: hearing loss, primarily in the right ear; status post left nephrectomy in the remote past (1987), history of gout in the left great toe, and major depressive disorder, in remission since 2002 (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant retains the

11

residual functional capacity for heavy, medium and light work with no climbing of ropes, ladders or scaffolds; no operation of foot pedal controls with the left foot/leg; no work in an excessively noisy environment or where acute hearing is required f[or] safety or job performance. He is limited to simple repetitive work with no frequent changes in work routines; no requirement for detailed or complex problem solving or independent planning.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on November 8, 1948 and was 55-years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a "disability," as defined in the Social Security Act, from June 15, 2004 through the date of this decision(20 CFR 404.1520(g)).

[AR at 17-21.]

Since the Decision was issued by the ALJ on December 15, 2006, the Court understands that the Department for Disability Determination Services has determined that Plaintiff was disabled

as of December 16, 2006, due to chronic lumbago and deafness.  [*See* Exhibit A to Plaintiff's Motion for Summary Judgment, Record No. 12.]

## II.  OVERVIEW OF THE PROCESS

The Administrative Law Judge ("ALJ"), in determining disability, conducts a five-step analysis:

> 1.  An individual who is working and engaging in substantial gainful activity is not disabled, regardless of the claimant's medical condition.
>
> 2.  An individual who is working but does not have a "severe" impairment which significantly limits his physical or mental ability to do basic work activities is not disabled.
>
> 3.  If an individual is not working and has a severe impairment which "meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s)", then he is disabled regardless of other factors.
>
> 4.  If a decision cannot be reached based on current work activity and medical facts alone, and the claimant has a severe impairment, then the Secretary reviews the claimant's residual functional capacity and the physical and mental demands of the claimant's previous work.  If the claimant is able to continue to do this previous work, then he is not disabled.
>
> 5.  If the claimant cannot do any work he did in the past because of a severe impairment, then the Secretary considers his residual functional capacity, age, education, and past work experience to see if he can do other work.  If he cannot, the claimant is disabled.

*Preslar v. Sec'y of Health and Human Services*, 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 CFR § 404.1520 (1982)).  "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." *Id.*  "If the analysis

13

reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Secretary." *Id.*

## III. STANDARD OF REVIEW

In reviewing the ALJ's decision to deny disability benefits, the Court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Instead, judicial review of the ALJ's decision is limited to an inquiry into whether the ALJ's findings were supported by substantial evidence, 42 U.S.C. § 405(g), *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001), and whether the ALJ employed the proper legal standards in reaching his conclusion, *see Landsaw v. Sec'y of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence" is "more than a scintilla of evidence, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip*, 25 F.3d at 286.

## IV. ANALYSIS

Plaintiff argues that the ALJ erred in determining that Plaintiff's conditions did not meet or equal a listing and that, notwithstanding Plaintiff's severe impairments, he had a residual functional capacity (hereinafter, "RFC") for medium work and that there were, thus, jobs that Plaintiff, then fifty-eight-years-old, could perform even though he could not perform his past work. [AR

14

at 18.]  Finally, Plaintiff appears to assign error to the ALJ due to an exchange of pleasantries with Plaintiff's counsel at the administrative hearing conducted in this matter.  For the reasons which follows, it is the Court's opinion that substantial evidence supported the ALJ's findings regarding Plaintiff's impairments and RFC and that the ALJ did not err in this regard.  Further, the Court finds that the exchange of pleasantries between the ALJ and Plaintiff's counsel does not constitute error.

**A.   Substantial Evidence Supports the ALJ's Finding that Plaintiff's Impairments Did Not Meet or Equal a Listing**

Plaintiff first argues that the ALJ erred because, in stating that a severe impairment was present but that Plaintiff's impairments did not meet or equal a listing, the ALJ offered no support for his conclusion.  This is clearly not the case, as the ALJ's Decision indicates that he considered the evidence of record at great length and, in fact, discussed it in some detail. [AR at 18-19.]  That said, Plaintiff argues that the ALJ should have found that Plaintiff's impairments met a listing, particularly as less than six months after the ALJ's decision, the Department for Disability Determination Services found that his same impairments met Listing 1.04 for spinal stenosis.[6]  Plaintiff also urges that

_____

[6]Plaintiff claims that the Department of Disability Determination Services recently found that Mr. Howard's same impairments met Listing 1.04 for spinal stenosis and Listing 12.04, for Affective Disorders, attaching as Exhibit A to his Motion for Summary Judgment a copy of the Disability Determination and Transmittal.  [Record No. 12 at 5 and Exh. A.]  The Court notes,

15

the ALJ should have considered whether the evidence of record indicated that Plaintiff met the listing for an affective disorder and should have ultimately determined that, in fact, Plaintiff met the listing for 12.04, Affective Disorders.  20 C.F.R. § 404 Subpart P, Listing of Impairments.

In order for a plaintiff to demonstrate that his impairment meets a Medical Listing, a plaintiff must have a medical condition described in the Listings, and a plaintiff must present evidence demonstrating that his impairment satisfies all of the requisite criteria in the Listing.  *See* 20 C.F.R. §§ 1525(c)(2), (3).  The plaintiff must also demonstrate that the impairment meets the duration requirement.  *See* 20 C.F.R. § 404.1525(c)(4); *see also* 20 C.F.R. § 404.1509.  In order to establish that an impairment is medically equivalent to a listed impairment, a plaintiff must show that his impairment is at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. § 404.1526(a); *see also King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).  The Commissioner is to consider all evidence in the record to determine if an impairment is medically equivalent.  *See* 20 C.F.R. § 404.1526(c).

To the extent that Plaintiff claims that he is disabled due to spinal stenosis and that the ALJ should have found that his condition met the requirements of Listing 1.04, the Court is not

---

however, that claimant was determined to be disabled as of December 16, 2006, due to "Chronic Lumbago" and "Deafness."  [*Id.* at Exh. A.]

persuaded.  The Court has reviewed the evidence of record in this matter and finds no evidence, substantial or otherwise, of a diagnosis of a disorder of the spine as required by Listing 1.04.[7]

---

[7]   Medical Listing 1.04 requires a diagnosis of a disorder of the spine with corresponding evidence that all of the criteria in either sections A, B, C, or D are met, as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Indeed, the only recent medical evidence of treatment for a condition of Plaintiff's back is a report of treatment for a "pulled back muscle carrying heavy chainsaw yesterday." [AR at 292.] Further, the agency consulting and examining physician noted a "normal examination of the spine with no evidence of motor neurologic defect . . . [and] no abnormality on examination of the spine.[8] [AR at 268.] This is to say that the decision of the ALJ, with no finding that Plaintiff suffered from or was disabled by spinal stenosis, is supported by substantial evidence and there is no error in this regard.[9]

As to Plaintiff's argument that the ALJ erred in not finding that Plaintiff's impairments met or medically equaled Listing

---

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

[8]     Plaintiff testified that, when his kidney was removed in the 1980s, his physician told him "that [he would] always be bothered with back pain" as "they had to cut all the muscles in one side" of his back during the surgery.  [AR at 403.]  Although his back had bothered him during the years that he worked for the highway department, his employer had let him switch to different jobs if it hurt too badly during a particular activity.  [AR at 403-04.]

[9]     To the extent that the Department of Disability and Determination Services has more recently determined that Plaintiff's "chronic lumbago" meets Listing 1.04, a finding which is not clear on the face of the documentation provided by Plaintiff, the Court cannot and should not attempt to intuit the rationale of the disability examiner in his or her review of Plaintiff's second application for benefits.  Indeed, the Court has no idea what evidence was before that examiner.  The Court can render a decision only on the evidence of record in the matter before it.  In this instance, the fact that a subsequent examiner has determined Plaintiff to be disabled has no bearing on the Court's consideration of the issues and record before it today.

18

12.04, for affective disorders, the Court is not persuaded. Indeed, notwithstanding Plaintiff's history of and treatment for depression, the evidence of record does not support a finding that he met the required level of severity for Listing 12.04, which requires a "[m]edically documented persistence, either continuous or intermittent, of" either depressive, manic, or bipolar syndrome (meeting certain criteria) which results in at least two of the following:

1.   Marked restriction of activities of daily living; or

2.   Marked difficulties in maintaining social functioning; or

3.   Marked difficulties in maintaining concentration, persistence, or pace; or

4.   Repeated episodes of decompensation, each of extended duration[.][10]

---

[10]   Alternatively, Listing 12.04 requires:

[A] medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.   Repeated episodes of decompensation, each of extended duration;

   or

2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Plaintiff argues that he has experienced such "marked" restrictions and difficulties as "marked" is defined by the nature and overall degree of interference with social functioning, or the ability to get along with others, including having a history of altercations, a fear of strangers, and social isolation. 20 C.F.R. § 404.12.00(e)(2). Plaintiff's averment that his psychiatric history and treatment notes indicate a history of altercations and periods of isolation aside, the Court has found only one reference to any history of altercations, when Plaintiff reported during mental health treatment that his daughter's former supervisor had tried to hit Plaintiff's car three times and that Plaintiff had been accused, himself, of trying to hit his daughter's former supervisor's vehicle on one occasion. [AR at 249 and 260.] There is no evidence of fear of strangers or social isolation.

Overall, the treatment notes from Plaintiff's psychiatric

mental demands or change in the environment would be predicted to cause the individual to decompensate;

or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

hospitalization and subsequent treatment do not support a finding that he experienced persistent depression marked by interference with social functioning, or the ability to get along with others, including a history of altercations, a fear of strangers, and social isolation.  Rather, the record evidence shows a period of intensive treatment for depression, which included an overnight hospitalization, from January through June of 2002, followed by no treatment or commentary on depression or mental health issues whatsoever.  At the time of his hearing before the ALJ, no treating or consulting physician or psychiatrist noted any marked limitations for Plaintiff due to depression.  Ultimately, substantial evidence of record supports the ALJ's finding that Plaintiff has suffered from one or at most two episodes of decompensation in the past and supports a finding that Plaintiff's impairment did not meet Listing 12.04.[11]

**B.  Substantial Evidence Supports the ALJ's Finding that Plaintiff Has RFC to Perform Medium Work**

Plaintiff next argues that the ALJ erred because he found that Plaintiff could perform the exertional limitations of medium work when there was no evidence of record to support how much lifting

---

[11]  Similarly, substantial evidence of record supports a finding that Plaintiff did not meet the alternative requirement of Listing 12.04 in that there is no evidence that Plaintiff suffers from a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support."

claimant could perform or for how long Plaintiff could stand considering his level of pain.  Plaintiff argues that, thus, the ALJ erred when he determined that Plaintiff, over the age of fifty-five, had the RFC to perform other work, considering 20 C.F.R. § 416.968.

As a general matter, if it is determined that an individual cannot perform past relevant work, the ALJ then assesses a claimant's RFC.  20 C.F.R. § 404.1520(4)(iv) and (v).  In so doing, the ALJ should consider the age, education, and work experience of the claimant to determine if an adjustment to other work can be made.  20 C.F.R. § 404.1519(v).  "[A]dvancing age [is considered] to be an increasingly limiting factor in the ability to adjust to other work."  20 C.F.R. § 415.963(a).  A person of age 55 or older is of "advanced age," which significantly affects a person's ability to adjust to other work.  20 C.F.R. § 416.063(e).

The Court notes that the sole medical evidence of record as to the amount of lifting or standing that Plaintiff could perform was related by the examining consulting physician, Dr. Ratliff, who opined that there was:

> . . . no evidence for restriction of stooping, bending, reaching, sitting, standing, moving about, lifting , carrying, handling objects or traveling.  His activities would be as tolerated by pain, especially when he has a flare up of gout.

[AR at 269.]  A lack of physical restrictions constitutes substantial evidence for a finding of non-disability.  *Nunn v.*

22

*Bowen,* 828 F.2d 1140, 1145 (6th Cir.1987). Further, the evidence of record shows that, insofar as Plaintiff has gout which causes pain that inhibits his ability to stand for a period of time, he experiences that condition only intermittently. [*See* AR at 269 (noting that Plaintiff was neither taking prophylactic medication nor had any evidence of acute gout during Dr. Ratliff's examination); AR at 390;] see also *Maher v. Secretary of Health & Human Services*, 898 F.2d 1106, 1109 (6th Cir. 1989) (when dealing with physical symptoms, symptom-free periods indicate non-disability if underlying impairment is generally insufficient to be disabling to particular claimant and individual periods of acute disability do not meet the twelve-month duration requirement).

Considering the evidence of record, the ALJ did not err in offering the VE a hypothetical which assumed no exertional limitations, in reaching a conclusion that Plaintiff had an RFC for medium work, or in reaching the conclusion that Plaintiff was not disabled, notwithstanding the fact that Plaintiff was more than fifty-five- years-old at the time of the ALJ's decision. 20 C.F.R. § 416.968(d)(4) directs a finding of disabled or further inquiry into Plaintiff's status only if Plaintiff is found to be limited to sedentary or light work. As substantial evidence of record supports the ALJ's finding that Plaintiff has an RFC for medium work, the ALJ did not err in this regard.

### C.  Plaintiff's Other Assignments of Error Are Without Merit

Finally, Plaintiff has complained that the ALJ:

> . . . spent a good portion of the time
> allotted, not discussing prior work history[,]
> but instead trying to determine whether Mr.
> Howard's attorney was in fact another daughter
> of Mr. Howard, who formerly worked at the
> Social Security Administration . . .

[Pl. Brief, Record No. 12, at 4.] He argues that, as a result, the ALJ "focused little on [Plaintiff's] medical conditions instead focusing on an incident involving that daughter's work at the Social Security Administration." [*Id.*] The Court has reviewed the hearing transcript and reflects that on balance, the ALJ spent relatively little time on these exchanges, and the Court sees no reference or allusion to an "incident" involving anyone's work at the Social Security Administration, although the ALJ did ask Plaintiff's counsel (one of his two daughters) if she had ever worked for the Social Security Administration. [AR at 377-78 and 414.] The transcript reflects short, polite exchanges between the ALJ and Plaintiff's counsel. Additionally, to the extent that counsel wished to place further emphasis on any particular medical condition or evidence of disability, beyond the questions posed by the ALJ, she was provided with an opportunity to elicit testimony from her client, of which she afforded herself. Ultimately, it was not error for the ALJ to exchange in pleasantries with counsel.

## V.   CONCLUSION

Having reviewed the record of this matter, this Court finds

that the ALJ's findings as to Plaintiff's impairments and RFC were supported by substantial evidence of record and that the ALJ did not err in exchanging pleasantries with counsel at the administrative hearing conducted in this matter.  The decision rendered by the ALJ and adopted by the Commissioner is **AFFIRMED**.

For the foregoing reasons, **IT IS ORDERED**:

(1)  That the Commissioner's motion for summary judgment [Record No. 13] be, and the same hereby is, **GRANTED**.

(2)  That the plaintiff's motion for summary judgment [Record No. 12] be, and the same hereby is, **DENIED**.

This the 6th day of March, 2008.



**Signed By:**

**_Joseph M. Hood_**

**Senior U.S. District Judge**